700 F.2d 433
 112 L.R.R.M. (BNA) 2813, 96 Lab.Cas. P 14,085,
4 Employee Benefits Ca 1081
 Loran W. ROBBINS, Marion M. Winstead, Harold J. Yates,
Robert J. Baker, Howard McDougall, Thomas F. O'Malley, and
R.V. Pulliam, Trustees of the Central States, Southeast
and Southwest Areas Pension Fund, Appellants,
v.
PROSSER'S MOVING AND STORAGE COMPANY, a Missouri
corporation, Appellee.
Loran W. ROBBINS, Marion M. Winstead, Harold J. Yates,
Robert J. Baker, Howard McDougall, Thomas F. O'Malley, and
R.V. Pulliam, Trustees of the Central States, Southeast and
Southwest Areas Health and Welfare and Pension Funds, Appellants,
v.
SCHNEIDER MOVING AND STORAGE COMPANY, a Missouri
corporation, Appellee.
 Nos. 80-2116, 80-2117.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1982.
Decided Feb. 16, 1983.
 
 Russell N. Luplow, Diana L.S. Peters, Bloomfield Hills, Mich., Donald J. Weyerich, Clayton, Mo., for appellants.
 Charles W. Bobinette, Bruce M. Wurmser, Uthoff, Wurmser & Graeber, St. Louis, Mo., for appellee Prosser's Moving & Storage Co.
 David F. Yates, St. Louis, Mo., for appellee Schneider Moving & Storage Co.; Suelthaus, Krueger, Cunningham, Yates & Kaplan, P.C., St. Louis, Mo., of counsel.
 Before LAY, Chief Judge, HEANEY, BRIGHT, and ROSS, Circuit Judges, HENLEY, Senior Circuit Judge, and McMILLIAN, ARNOLD, and JOHN R. GIBSON, Circuit Judges, en banc.
 ARNOLD, Circuit Judge.
 
 
 1
 These cases present important questions of labor law touching on the rights and obligations of trustees of Taft-Hartley Act pension and welfare funds in disputes with employers over their contributions to the funds. The trustees in these cases filed suits as third-party beneficiaries of the collective-bargaining agreements between the employers and the union. The District Court, relying largely on Central States, Southeast & Southwest Areas Pension Fund v. Howard Martin, Inc., 625 F.2d 171 (7th Cir.1980), held in both cases that the trustees were obligated by the collective-bargaining agreements to submit their differences to arbitration. A divided panel of this Court reversed, holding that the trustees could sue in the District Court without resort to arbitration. Robbins v. Prosser's Moving & Storage Co. & Schneider Moving & Storage Co., Nos. 80-2116, 80-2117 (8th Cir. March 24, 1982) (per curiam). Because that decision appeared to conflict with prior decisions of this Court, we granted rehearing en banc. We now reverse the District Court and overrule those prior decisions to the extent of any inconsistency with this opinion. Our conclusion is that the national pension policy embodied in the Labor Management Relations Act (LMRA), the Employee Retirement Income Security Act (ERISA), and the Multiemployer Pension Plan Amendments Act (MPPAA), together with the terms of the collective-bargaining agreement and accompanying trust instruments, dictate that these trustees not be bound by the arbitration procedure, which they have no right to initiate.
 
 I.
 
 2
 The facts of these two cases differ somewhat. The plaintiffs are trustees of the Central States, Southeast and Southwest Areas Pension Fund and Central States, Southeast and Southwest Areas Health and Welfare Fund, both of which were established pursuant to Sec. 302(c)(5) of the Labor Management Relations Act of 1947 (commonly referred to as the Taft-Hartley Act), 29 U.S.C. Sec. 186(c)(5). The complaints, which were filed against Prosser's Moving & Storage Company and Schneider Moving & Storage Company, are based on collective-bargaining agreements between the defendants and Local 610 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 
 
 3
 The complaint in No. 80-2117 alleged that Schneider had been a party to successive collective-bargaining agreements with Local 610 from March 1, 1970, through February 28, 1979, which required Schneider to make certain contributions to the Pension Fund and the Health and Welfare Fund for each employee covered by the agreement.[1] According to the complaint, the agreement required contributions to be made by the fifteenth day of each month and obligated Schneider to furnish the trustees with a monthly contribution report containing the names of and hours worked by each employee and the contributions required on behalf of each. The plaintiffs further claimed authorization under the collectivebargaining agreements and the trust agreements to audit the employer's records to determine if all required contributions had been made. Schneider was alleged to have violated the agreement by refusing to allow the trustees to audit its payroll records, by failing to furnish the required monthly report, and by repeatedly failing to submit the monthly reports and payments on their respective due dates. Designated Record (D.R.) 3-5. The trustees prayed for an accounting and for all sums determined to be due, together with costs and attorneys' fees as provided in the agreements. D.R. 6-7. The complaint in No. 80-2116 against Prosser was almost identical.
 
 
 4
 The cases seem to differ in two respects: In February of 1979, a decertification election was held at the Schneider Company, and the Union was decertified as the representative of Schneider's employees. Second, as to the defendant Prosser the real controversy seems to revolve around the trustees' right to conduct an audit of the company's records. Schneider has already submitted to an audit. Schneider has sought to emphasize that its dispute with the plaintiffs is a question of coverage of some employees under the agreement, not the right of the plaintiffs to conduct the audit.
 
 
 5
 The defendants moved to dismiss both actions on the ground that the controversy should have been submitted to arbitration under the terms of the collective-bargaining agreements. The District Court, relying on Central States v. Howard Martin, supra, agreed with the defendants and dismissed both complaints without prejudice pending the outcome of arbitration. The Court's opinion accepted Howard Martin's dichotomy of such suits into "simple collection matters," for which arbitration is not a prerequisite to suit, and more complex actions requiring interpretation of the collective-bargaining contract, in which arbitration is required. Both suits were found by the District Court to involve questions of coverage of certain employees under the agreement and therefore held to present questions of contract interpretation.
 
 II.
 
 6
 Defendants' argument for compulsory arbitration is based on provisions in the collective bargaining contract, on the national labor policy favoring arbitration embodied in the Steelworkers Trilogy,[2] and on precedent. Close examination reveals that none of these supports will bear the weight of the defendants' position. Moreover, other important considerations, which we will discuss presently, militate against requiring arbitration.
 
 A.
 
 7
 First, Prosser and Schneider contend that since the plaintiffs sue as third-party beneficiaries of the union contract, they should be bound by the grievance-arbitration procedures contained in the contract. The argument is based on traditional notions of third-party-beneficiary contract law: The third party seeking to enforce the agreement is bound by the terms of the contract and subject to the same defenses as the original promisee would be. Defendants are correct as a general proposition that "[t]he promisor may ... usually assert against the beneficiary any defense which he could assert against the promisee if the promisee were suing on the contract." Calamari & Perillo, Contracts 623 (2d ed. 1977). This rule is, however, not without exception, and the Supreme Court has held collective-bargaining agreements to be such an exception. Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), was a suit by pension-fund trustees seeking to compel an employer to contribute to the fund. The issue before the Supreme Court was "whether the agreement is to be construed as making performance by the union [which had been made a third-party defendant] of its promises a condition precedent to Benedict's promise to pay royalty to the trustees." Id. at 465, 80 S.Ct. at 493. The Court held that collective-bargaining agreements are not typical third-party-beneficiary contracts and rejected Benedict's assertion, noting that "[i]f Benedict and other coal operators having damage claims against the union for its breaches may curtail royalty payments, the burden will fall in the first instance upon the employees and their families across the country." Id. at 469, 80 S.Ct. at 495.[3]
 
 
 8
 While Lewis is arguably distinguishable from the instant case in that it dealt with a proffered substantive defense to the suit rather than the procedural defense of arbitration, the case is recognized as establishing an exception to the general rule that defenses good against the promisee are good against donee beneficiaries such as the Funds. Calamari & Perillo, supra, at 624 n. 26. See also Todd v. Casemakers, 425 F.Supp. 1375 (N.D.Ill.1977); Wishnick v. One Stop Food & Liquor Store, 359 F.Supp. 239 (N.D.Ill.1973). And while Lewis alone may not be dispositive of Schneider's and Prosser's cases, it does refute their argument that the trustees, as third-party beneficiaries, are subject to the same defenses as could be asserted against a suit by the union.
 
 B.
 
 9
 Second, defendants argue that the well-established national policy favoring arbitration as a means of resolving labor disputes compels the conclusion that arbitration is required in disputes such as these. The Steelworkers Trilogy, supra, is cited as favoring arbitration of all industrial labor disputes. The defendants, however, overlook certain limitations inherent in the Court's decisions in those cases. First, as Justice Douglas pointed out, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Steelworkers v. Warrior & Gulf Co., 363 U.S. at 582, 80 S.Ct. at 1353. The arbitral process is, moreover, part of the collective-bargaining process. Steelworkers v. American Mfg. Co., 363 U.S. at 570, 80 S.Ct. at 1364 (Brennan, J., concurring). The arbitration clause and the "no strike" clause are generally each quid pro quo for the other. Id. at 567, 80 S.Ct. at 1346. And, as we shall explain, other important policies, such as the enforcement of federal statutory rights, may in a particular case have to be balanced against the policy favoring arbitration.
 
 
 10
 We recognize that defendants' position has support in past decisions of the Seventh Circuit and of panels of this Court. This very type of dispute has been held subject to arbitration by the Seventh Circuit in Central States v. Howard Martin, supra. The facts in Howard Martin are essentially the same as in Schneider's case. The opinion divides such suits into "simple collection matters," in which arbitration is unnecessary, and all those others in which some issue of contract interpretation is raised in defense. The precise meaning of the phrase "simple collection matters" is unclear, but it seems to mean something like cases of clear liability. See Health Care Employees v. Constant Care Community Health Center, 669 F.2d 213, 215 (4th Cir.1982) (adopting the Howard Martin dichotomy but refusing arbitration where no substantive contractual defense was raised). The Howard Martin court, sensitive no doubt to the objection that the trustees have no right to invoke arbitration, replied that
 
 
 11
 [t]o trigger the arbitration process, the Funds need only inform the Union, the members of which the Funds exist to serve, that Martin disputes the coverage of certain workers and ask the Union, the organization of primary interest, to file a grievance against Martin.
 
 
 12
 Central States, Southeast & Southwest Areas Pension Fund v. Howard Martin, Inc., supra, 625 F.2d at 173 (footnote omitted).
 
 
 13
 The defendants also aptly cite Farmer v. Fisher, 586 F.2d 1226 (8th Cir.1978), in which three union-appointed trustees brought an action in a district court to secure the appointment of "an impartial umpire" under Sec. 302(c)(5)(B) of the LMRA, 29 U.S.C. Sec. 186(c)(5)(B), to break a deadlock between them and the three employer-appointed trustees. The deadlock was over whether the trust should sue the employer to collect certain allegedly delinquent contributions. The question of delinquency vel non depended on interpretation of the collective-bargaining agreement. The district court appointed the impartial umpire as requested, but this Court reversed. It held that questions of contract interpretation had to be resolved by the arbitration procedure set forth in the collective-bargaining agreement. The very trust agreement involved provided that "[n]o dispute or question arising under this Trust ... shall be subject to the grievance or arbitration procedure provided for in any collective bargaining agreement." Id. at 1228. But the Court nevertheless held that arbitration was required, on the ground that the case did not involve trust "administration," as contemplated by the LMRA's deadlock provision, but rather an extraordinary, non-trust issue of contract interpretation. Foreshadowing the Howard Martin distinction, the Court said that "[t]he right of trustees as a body to sue for contributions under other circumstances, as, for example, where the right to contributions is undisputed, is not before us." Id. at 1229 n. 4. The only effect of the decision, it was said, was to change the initial forum in which the trust's rights would be decided from a court to an arbitration proceeding. No substantive rights of trustees or beneficiaries would be affected.
 
 
 14
 Similarly Prosser emphasizes, and quite properly, this Court's decision in Central States, Southeast & Southwest Areas Pension Fund v. CRST, 641 F.2d 616 (8th Cir.1981). There the Court affirmed the dismissal of a suit by trustees to compel inspection of employment and earnings records of all the employees of CRST. The trustees were entitled to see only the records of covered employees, the Court said, as that term is defined in the collective-bargaining agreement, and if a dispute arises as to who is covered, the grievance and arbitration procedure provided in that agreement should be used. The Funds have no right to invoke those procedures, but "it would appear that in the event a dispute should arise respecting coverage, the duty of fair representation would impel the Union to invoke the grievance machinery if the Funds were to request such action." Id. at 618.
 
 
 15
 Also part of this line of authority is Layne-Western Co. Inc. v. Int'l Union of Operating Eng'rs, 650 F.2d 155 (8th Cir.1981), which holds, relying on Howard Martin and Farmer v. Fisher, supra, "that the issue of whether contributions are due to the funds for certain types of work performed under the collective bargaining agreements ... presents a question of interpretation of the collective bargaining agreement and therefore an issue for the arbitrator." Id. at 158. Layne-Western is not so closely in point as Howard Martin, Farmer v. Fisher, and CRST. It was not an action by trustees against the employer to collect contributions claimed to be delinquent. It was a suit by the employer against the union to enjoin a strike called to protest the company's failure to make certain disputed payments. There was not even a potential divergence between the views and interests of the trustees and those of the union. It was clear that the union, which had gone to the length of striking over the issue, could be depended on to pursue arbitration vigorously, if that should turn out to be the indicated remedy. In addition, the Court stressed that once the arbitrator had determined what work was covered under the contract the trustees would have a right to "audit the appropriate payroll records of any Employer." Id. at 158 n. 4.
 
 
 16
 There is no doubt that these cases support defendants' position. Farmer and Layne-Western, if not CRST, are closely in point and would normally govern our conclusion. On reflection, however, we believe that they were not correctly decided. Stare decisis is an important aspect of the judicial process, but sometimes it is more important to be correct than to be consistent. After carefully considering the implications of several recent cases, all of them decided after Howard Martin, and after analyzing the relationship between unions and Sec. 302(c)(5) funds, we are convinced that we should depart from the panel opinions described above.
 
 C.
 
 17
 The national pension policy embodied in Sec. 302(c)(5), of the LMRA, 29 U.S.C. Sec. 186(c)(5), in the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Secs. 1001 et seq., and in the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. 96-364, 94 Stat. 1295, 29 U.S.C.A. Secs. 1132a et seq. (1976-81 Supp.), confers statutory rights on beneficiaries of funds like those that brought this case. Although these rights of course originate in the private contract between union and employer, Congress has chosen to give them considerably more protection than the traditional state-law action for breach of contract would afford. Recent Supreme Court cases illuminate the nature of this protection and underscore the important differences between unions and trust funds.
 
 
 18
 In NLRB v. Amax Coal Co., 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), the Court emphasized that ERISA codified the trustee's obligations at common law:
 
 
 19
 ERISA essentially codified the strict fiduciary standards that a Sec. 302(c)(5) trustee must meet. See 29 U.S.C. Sec. 1002(1) & (2) ... Section 404(a)(1) of ERISA requires a trustee to "discharge his duties ... solely in the interest of the participants and beneficiaries ...." [citations omitted]. Section 406(b)(2) declares that a trustee may not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. Sec. 1106(b)(2).
 
 
 20
 Id. at 332-33, 101 S.Ct. at 2795-96. The incorporation of common-law principles into the statute was further described in Justice Stewart's opinion for the Court:
 
 
 21
 Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. Restatement (Second) of Trusts Sec. 170(1) (1957); 2 A. Scott, Law of Trusts Sec. 170 (1967). To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalty must be enforced with "uncompromising rigidity." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (Cardozo, C.J.).
 
 
 22
 Id. at 329, 101 S.Ct. at 2794.
 
 
 23
 The question presented in Amax was whether employer-appointed trustees of a Sec. 302(c)(5) fund were "representatives" of the employer "for the purposes of collective bargaining or the adjustment of grievances" within the meaning of Sec. 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(1)(B). The union had struck in an attempt to get the employer to continue contributing to national trust funds for the benefit of employees. The company wanted to establish its own trust fund for the employees at one of its mines, and to name the management trustees of that fund. The national funds, on the other hand, were contributed to by many employers. Amax, as a member of the Bituminous Coal Operators Association, had had a voice in selecting the management trustees of the national funds, but if its contributions were to go to a separate, one-mine fund, it alone would select all the management trustees of that fund. Amax claimed that the union's efforts were an unfair labor practice under Sec. 8(b)(1)(B), on the theory that trustees were collective-bargaining representatives of management, and that the union was trying to coerce Amax in the selection of these representatives. The Court rejected this argument. It noted that "nothing in the language of Sec. 302(c)(5) reveals any congressional intent that a trustee should or may administer a trust fund in the interest of the party that appointed him ...." 453 U.S. at 330, 101 S.Ct. at 2794. It stressed the separateness of the fund and its trustees from both the union and the employer. And it referred approvingly to the following remarks by one of the two sponsors of Sec. 302(c)(5):
 
 
 24
 Senator Ball stated that "all we seek to do by [Sec. 302(c)(5) ] is to make sure that the employees whose labor builds this fund and are really entitled to benefits under it shall receive the benefits; that it is a trust fund, and that, if necessary, they can go into court and obtain the benefits to which they are entitled." 93 Cong.Rec. 4753 (1947) ....
 
 
 25
 Id. at 331, 101 S.Ct. at 2795.
 
 
 26
 We also find language in Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), of some relevance. There, the Court referred to the MPPAA, which added a new Section 515 to ERISA, 29 U.S.C.A. Sec. 1145 (1976-81 Supp.), reading as follows:
 
 
 27
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 
 
 28
 Id. at 86, 102 S.Ct. at 861 (footnote omitted). The Court referred to a passage from the legislative history of this new section:
 
 
 29
 The provision which was eventually enacted as [Sec. 515] was added to S. 1076 by the Senate Committee on Labor and Human Resources. The Committee explained that the provision was added because "simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions," and steps must be taken to "simplify delinquency collection." Senate Committee on Labor and Human Resources, S. 1076--The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 96th Cong., 2d Sess., 44 (Comm. Print, Apr. 1980) (1980 Senate Labor Committee Print) (emphasis added). During floor debate, Senator Williams and Representative Thompson explained the purpose and meaning of [Sec. 515] in the same language used in the Senate Labor Committee Print.
 
 
 30
 Id. at 87, 102 S.Ct. at 861 (footnote omitted). The disapproving reference to what complicated defenses raised by employers have done to "simple collection actions" is striking in light of the Howard Martin court's use of the same phrase.[4]
 
 
 31
 The Court recently underscored again the importance of the funds' independence from the union, and the distinctions between the union's interests and those of the beneficiaries. In United Mine Workers of America Health & Retirement Funds v. Robinson, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), the following description appears of Sec. 302(c)(5):
 
 
 32
 The section was meant to protect employees from the risk that funds contributed by their employers for the benefit of the employees and their families might be diverted to other union purposes or even to the private benefit of faithless union leaders. Proponents of this section were concerned that pension funds administered entirely by union leadership might serve as "war chests" to support union programs or political factions, or might become vehicles through which "racketeers" accepted bribes or extorted money from employers.
 
 
 33
 Id. at 1232. The Court also remarked, id. at 1233, that "potential beneficiaries [of Sec. 302(c)(5) funds] are [sometimes] not members of the bargaining unit" that the union is obligated to represent. "[F]ormer members and their families may suffer from discrimination ... because the union need not 'affirmatively ... represent [them] or ... take into account their interests in making bona fide economic decisions in behalf of those whom it does represent.' Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n. 20 [92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341]." Id. at 1233-34 (footnote omitted).[5]
 
 
 34
 The Supreme Court has, moreover, recently reemphasized that certain statutory labor rights, for example rights under the Fair Labor Standards Act, are not subject to waiver under a grievance-arbitration clause. Barrentine v. Arkansas Best Freight System, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). Although Barrentine involved a different right from those under consideration here, it at least shows that the presumption in favor of arbitration is not, of itself, sufficient to place statutory rights or obligations, such as those imposed on trustees and employers by ERISA and MPPAA, under the arbitral process. Cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII cause of action not subject to arbitration).
 
 
 35
 The notion of nondelegability and non-waiver of the trustees' responsibilities has also received pointed support in the Third Circuit's recent decision in Rosen v. Hotel & Restaurant Employees, 637 F.2d 592 (3d Cir.1981). Rosen is particularly important because of the difficult, if not untenable, position in which it would place the trustees if Howard Martin were followed. In that case a retired employee sued his union and the pension fund to recover his pension under the collective bargaining agreement. The fund asserted that Rosen did not have the required years of credited service because his employer had failed to make contributions for some years of his employment. The Court of Appeals held Rosen entitled to a pension because the trustees had a fiduciary obligation to notify him, as a future beneficiary of the fund, that his pension was in jeopardy by reason of his employer's failure to contribute. The court found this duty in the trustees' common-law obligations, as codified in ERISA.[6] Crucial to the present discussion was this statement by the Third Circuit:
 
 
 36
 In addition, defendants' status as fiduciaries requires them to take action against employers who fail to contribute to the fund as required by the plan. This obligation could require the trustees to commence suit, or to picket the non-contributing employer; but some action must be taken to safeguard beneficiaries' credited service.
 
 
 37
 Id. at 600. It seems that the trustees of Taft-Hartley pension funds are in danger of being whipsawed by the decisions in Rosen and Howard Martin. In the Third Circuit they are under a probable duty to sue for delinquent contributions, and in the Seventh Circuit they are prevented from doing so in many cases.
 
 D.
 
 38
 We do not claim that these recent Supreme Court opinions require us to depart from our prior panel opinions, or that Rosen is logically irreconcilable with them. The cases we have summarized all arose in different contexts, and none of them focused on the precise question presented here. But they are suggestive enough to raise serious questions about the rationale of Farmer, CRST, and Layne-Western. Basically, those cases say fund trustees can easily get the union to pursue arbitration, or sue it for not doing so. We cannot agree that unions can be expected to act so readily in the funds' interests.
 
 
 39
 The union's and the funds' interests will not always be in harmony. The union's primary interest, and properly so, is in keeping as many of its members as possible working, with the best possible wages and working conditions. Arbitration costs money, and the union may have better or more pressing uses for its limited funds.[7] It may not wish to bear its half of the cost of an arbitration proceeding. In addition, the pressing of a claim for, say, an audit of the employer's books may irritate the employer in a way incompatible with the union's own legitimate goals. A pension-fund claim can result in a liability of many thousands of dollars for the employer. The union may prefer for that money to be available to pay the wages of its members who are now working, rather than to support former employees, or the families of deceased former employees. Worries about the present are for most union members (and for most other people, too) more pressing than worries about the future. The union may be inclined to trade off a potential pension-fund claim against some other bone of contention in its relations with the employer. And such a decision may be completely legitimate. In order to succeed in a suit against a union for an alleged breach of the duty of fair representation, the trustees would have to show something more than a mere refusal to take an arguably meritorious pension or welfare claim to arbitration. "[A] union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." Vaca v. Sipes, 386 U.S. 171, 192, 87 S.Ct. 903, 918, 17 L.Ed.2d 842 (1967). As the Supreme Court has held, moreover, Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., supra, the union has no affirmative duty to represent those who are no longer members. It may not even (as in Schneider's case) represent the employer's current employees. Defendants suggest that the trustees, in addition to asking the union to invoke arbitration, could also seek administrative or criminal remedies, but those avenues are even more remote and uncertain than the second-hand access to arbitration that is put forward as the funds' main recourse.
 
 
 40
 The union and a pension fund are both fiduciaries. But they represent groups and interests that only partly coincide. We conclude that the national pension policy described above, and the rights of plan beneficiaries, can be vindicated as Congress seems to have intended only if trustees are given a direct right of access to the courts.
 
 III.
 
 41
 Certainly it is true that arbitration, pension funds, and health and welfare funds, are all matters of contract. They either exist or not as the parties have agreed in the collective-bargaining contract and related documents. If the agreements in the cases before us provided in express words that trustees' claims could not come to court before questions of contract interpretation had been settled by arbitration, this would be quite a different case. But they do not. In fact, Article III, Sec. 5 of both trust indentures give the trustees the right to "examine pertinent records of each employer ... whenever such examination is deemed necessary or advisable by the Trustee in connection with the proper administration of the trust," and Article III, Sec. 4, reads as follows:
 
 
 42
 [the] Trustees shall take such steps, including institution and prosecution of, and intervention in, any legal proceedings that the Trustees in their discretion deem in the best interest of the fund to effectuate the collection or preservation of contributions or other amounts which may be owed to the trust fund, without prejudice, however, to the rights of the Union to take whatever steps which may be deemed necessary for such purposes." (emphasis supplied).[8]
 
 
 43
 Whatever else may be said about these provisions, one thing is clear: they do not unambiguously subject the trustees' rights and obligations to the union's privilege of invoking the arbitration process under the collective-bargaining agreement. The union may choose to assist the funds by invoking this process. Our holding in no way obstructs that alternative avenue of redress. Nor need we decide in the cases before us how to accommodate the judicial and arbitral processes and their results if both are invoked with respect to the same pension or welfare claim.[9] We hold only that the trustees may come into court without first getting the union to invoke the machinery of arbitration. To the extent that Farmer, Layne-Western, and CRST are inconsistent with this holding, they are overruled.
 
 
 44
 We leave all other questions, including possible defenses of waiver, estoppel, laches, and limitations, to the District Court for exploration on remand. The judgments are reversed, and the causes remanded for further proceedings consistent with this opinion.
 
 
 45
 It is so ordered.
 
 
 46
 HENLEY, Senior Circuit Judge, with whom JOHN R. GIBSON, Circuit Judge, joins, dissenting.
 
 
 47
 Today the court makes bad law.[1] It unnecessarily overrules three prior decisions of this court, rejects the reasoning of the Seventh Circuit in Martin and erodes the pronouncements of the Supreme Court in the Steelworkers Trilogy. Its decision may be perceived as doing disservice to the national policies of maintaining industrial peace, avoiding delay and deferring to the expertise of persons acquainted with industry standards and the law of the shop.
 
 
 48
 In prior decisions, this court has concluded that trust fund disputes requiring interpretation of collective-bargaining agreements initially should be submitted to arbitration.[2] Lange-Western Co. v. International Union of Operating Engineers, 650 F.2d 155 (8th Cir.1981); Farmer v. Fisher, 586 F.2d 1226 (8th Cir.1978); see Central States, Southeast & Southwest Areas Pension Fund v. CRST, Inc., 641 F.2d 616 (8th Cir.1981); see also Health Care Employees v. Constant Care Community Health Center, Inc., 669 F.2d 213 (4th Cir.1982); Central States, Southeast & Southwest Areas Pension Fund v. Howard Martin, Inc., 625 F.2d 171 (7th Cir.1980); International Brotherhood of Electrical Workers v. Dave's Electric Service, Inc., 382 F.Supp. 427, 433 (M.D.Fla.1974), remanded on other grounds, 545 F.2d 987 (5th Cir.1977). The court rejects the reasoning of these cases, holding instead that benefit fund trustees may initiate suit in federal court without resort to arbitration, even where the dispute in question involves issues of contract interpretation. I cannot agree with this departure from precedent.
 
 
 49
 We are told that in the Prosser case the basic question may be the right of the trustees to an audit of company accounts to determine whether appropriate payments have been made, but that Schneider has submitted to audit and that the basic question raised relates to coverage. However, the reach of the court's opinion is not narrowed to audit issues, and it seems clear that in essence the underlying dispute in the cases at bar concerns the coverage of certain employees, for purposes of contribution, under the collective-bargaining agreements.[3] This issue, to be properly answered, requires resort to and interpretation of those contracts, and, therefore, under the terms of the agreements must be submitted to arbitration.[4]
 
 
 50
 In the Steelworkers Trilogy,[5] the Supreme Court articulated the strong federal policy favoring arbitrability of labor disputes. This policy, based upon the national goal of industrial peace, see, e.g., Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 377-79, 94 S.Ct. 629, 636-37, 38 L.Ed.2d 583 (1974), provides an efficient and expeditious means of dispute resolution in the labor context, utilizing impartial arbitrators possessing specialized knowledge with respect to the industry and issues involved. In my view, this presumption of arbitrability is applicable to the basic dispute from which these appeals stem.
 
 
 51
 The court, in reaching a contrary result, relies in large part upon recent Supreme Court decisions in the area of national pension policy. Although these opinions do discuss differences between unions and trust funds in this context, the majority concedes, ante, at 441, that the decisions do not compel departure from the prior panel opinions of this court. Indeed, there is nothing in the cited decisions, or the references to legislative history there included, that persuades me to abandon the traditional policy favoring the arbitration of disputes concerning the interpretation of collective-bargaining agreements. Nor do I believe that continued adherence to this policy in present context conflicts to any significant degree with the independence or obligations of the benefit fund trustees. The independence of the trustees is adequately protected not only by case law but also by the mandates of the LMRA and ERISA; further, if after the trustees have requested arbitration the union does not pursue that remedy, or fails to act in the best interest of the fund beneficiaries, the trustees are free to seek redress in the courts.
 
 
 52
 It is to be remembered that the unions have a duty of fair representation which impels them to invoke the grievance machinery in appropriate circumstances, Central States, Southeast & Southwest Areas Pension Fund v. CRST, Inc., 641 F.2d at 618, and this court should not presume a violation of that duty.[6] Rather, it should reject hypothetical and unlikely threats to the independence of the trustees and require the parties first to resort to arbitration, where the law of the shop and the terms of the collective-bargaining agreements may best be interpreted. One need not be clairvoyant to foresee that the spirit of negotiation and compromise that forms the basis for such agreements might be seriously compromised if the parties become aware that the terms of the agreements might be safely ignored or interpreted initially other than through the arbitration machinery.
 
 
 53
 Absent some reasoning more compelling than that which the court has been able to muster, I am unable to justify, much less to join in, its decision.[7] Accordingly, I dissent.
 
 
 
 [1]
 Jurisdiction was alleged under Sec. 301 of LMRA, 29 U.S.C. Sec. 185(a), and Sec. 502 of ERISA, 29 U.S.C. Sec. 1132
 
 
 [2]
 Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [3]
 The Court also expressed its concern, in words that are apt in the present context, with "protecting the interests of beneficiaries of the welfare fund, many of whom may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs." Id. at 470, 80 S.Ct. at 496 (1960) (emphasis added). It would be unjust and contrary to the national labor policy, the Court reasoned, to reduce a recovery in favor of beneficiaries of a fund by reason of some default on the part of the union. "[T]he fund is in no way an asset or property of the union." Id. at 465, 80 S.Ct. at 493
 
 
 [4]
 The quoted Senate Committee print also states that "[r]ecourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly." Senate Comm. on Labor and Human Resources, 96th Cong., 2d Sess. 44 (Comm. Print 1980). In the House, moreover, Representative Thompson, Chairman of the Committee on Education and Labor and floor sponsor of the House companion bill, stated: "Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law--other than 29 U.S.C. 186," the provision making certain employer payments to labor organizations illegal. 126 Cong.Rec. 23039 (1980) (emphasis added)
 Kaiser had to do with the employer's right to assert, in a court action brought by trustees, the defense of illegality. We quote the legislative history of MPPAA here simply to demonstrate Congress's recently expressed resolve to facilitate efforts by trustees to enforce employers' obligations. Issues of arbitrability can be quite complex, and allowing them to be injected into trustees' collection suits can frustrate this legislative purpose.
 
 
 [5]
 The following passage from Allied Chemical, supra, 404 U.S. at 181, n. 20, 92 S.Ct. at 398 n. 20, quoted with approval in Robinson, supra, 102 S.Ct. at 1234 n. 14, is also significant:
 Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. See generally Note, 70 Col.L.Rev. 909, 916-920 (1970). The retiree, moreover, would have a federal remedy under Sec. 301 of the Labor Management Relations Act for breach of contract if his benefits were unilaterally changed. See Smith v. Evening News Assn., 371 U.S. 195, 200-201, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962); Lewis v. Benedict Coal Corp., 361 U.S. 459, 470, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960).
 This reasoning would be rendered nugatory by a rule of law that makes trustees' access to the courts subject to an effective veto by the union.
 
 
 [6]
 In so holding, the Third Circuit relied on our decision in Phillips v. Kennedy, 542 F.2d 52, 55 n. 8 (8th Cir.1976)
 
 
 [7]
 In Prosser's case the union on one previous occasion refused to arbitrate a trust-fund claim arising under the 1976 collective-bargaining agreement, even though the employer requested arbitration. We do not know why. In its motion to dismiss in the District Court, Prosser's claimed, inter alia, that this union conduct should estop the trustees to inspect records for the period in question
 
 
 [8]
 The arbitration clause in the collective-bargaining agreements applies "should difference arise between the Company and the Union or any employee of the Company as to the meaning or application of the provisions of the Agreement." (Emphasis ours.)
 
 
 [9]
 There may be some danger that courts will interpret agreements in a way different from arbitrators. We note, however, that courts are permitted to consider the reasoning of arbitration panels that have previously interpreted provisions similar to the ones sub judice
 
 
 [1]
 No effort is made to qualify the decision as falling either within or beyond any of the "bad law" categories mentioned by Justice Rehnquist in his dissent in Larkin v. Grendel's Den, Inc., --- U.S. ----, ----, 103 S.Ct. 505, 512, 74 L.Ed.2d 297 (1982)
 
 
 [2]
 In contrast, cases involving matters of trust fund administration, such as collection actions, need not be submitted to arbitration. E.g., Layne-Western Co. v. Int'l Union of Operating Eng'rs, 650 F.2d 155, 158 (8th Cir.1981). Since such disputes do not require the interpretation of a collective-bargaining agreement, the policies justifying deferral to arbitration are largely inapplicable
 
 
 [3]
 Both suits were found by the district court to involve questions of coverage of certain employees
 
 
 [4]
 The collective-bargaining agreements at issue provide the definition of the term "covered employees"; indeed, this term is not defined in any of the ancillary documents. The agreements also provide a grievance-arbitration mechanism "should differences arise between the Company and the Union or any employee of the Company as to the meaning or application of the provisions of the Agreement." This provision is sufficiently broad to encompass the underlying dispute--employee coverage--in the instant cases. See Steelworkers Trilogy, infra note 5 (in light of national policy favoring arbitration, general arbitration provisions are to be broadly construed)
 
 
 [5]
 United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [6]
 It is, of course, somewhat troubling that the union was apparently decertified as the employees' representative in No. 80-2117. However, the union still exists, as does its duty of fair representation, and as noted, the trustees would be free to seek judicial redress should resort to arbitration prove unsuccessful
 
 
 [7]
 Since the instant appeals were submitted, the Sixth Circuit has filed its opinion in Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 698 F.2d 802 (6th Cir.1983). To the extent that the considerations in Central Transport parallel those raised here, the views expressed in this dissent appear to be consistent with the reasoning employed by the Sixth Circuit