**MO–KAN TEAMSTERS PENSION FUND, et al., Plaintiffs,**

v.

**BOTSFORD READY MIX CO., et al., Defendants.**

No. 84–0193–CV–W–3.

United States District Court, W.D. Missouri, W.D.

April 2, 1985.

Albert J. Yonke, Kansas City, Mo., for plaintiffs.

John Bestor, Kansas City, Mo., for defendants.

### ORDER

ELMO B. HUNTER, Senior District Judge.

Before the Court is defendants' motion to dismiss for lack of subject matter jurisdiction. Defendants assert that the statutes claimed by the plaintiffs to support jurisdiction are inapplicable to this cause and that the conduct complained of is within the exclusive jurisdiction of the N.L.R.B. The parties have filed a stipulation of uncontroverted facts for the Court's use in ruling on the motion.

This is an action to collect 20% of fringe benefit contributions covering a period of twenty-two days, liquidated damages, and attorney's fees. Plaintiffs are the Mo-Kan Teamsters Pension Fund, the Mo-Kan Teamsters Health and Welfare Fund (collectively referred to herein as the "Funds," and individually referred to as the "Pension Fund" and "Health and Welfare Fund") and the respective Trustees of each of the Funds. Each of the defendants is an employer that has contributed, and presently contributes to the Funds on behalf of its employees who are represented for purposes of collective bargaining by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local Union No. 541 ("Local 541").

Prior to April 1, 1983, defendants were bound by the terms of a collective bargaining agreement negotiated by The Builders Association of Missouri (the "Builders Association") and Local 541, or by separate agreements incorporating identical terms regarding the payment and reporting of fringe benefits to the Funds. On or about January 25, 1983, each of the defendants wrote to Local 541, giving notices pertinent to that defendant's termination of the existing collective bargaining agreement, its withdrawal from the Builders Association, and its intention regarding the negotiation of a new agreement with Local 541. Each of the letters was identical in content. The letters of January 25, 1983 were timely notices and did effect a termination of the collective bargaining agreement with respect to each of the defendants effective April 1, 1983.

Upon withdrawing from the group of employers that were represented for purposes of collective bargaining by the Builders Association, the defendants and some other employers in the same business (production and sale of ready-mix concrete) formed the Concrete Producers Association

of Metropolitan Kansas City, Inc. (Producers Association"). Defendants' negotiations for new collective bargaining agreement with unions representing their employees, including Local 541, were conducted through a bargaining committee of that organization.

As of April 1, 1983, representatives of the Producers Association and Local 541 had not agreed to the terms of a new collective bargaining agreement. Effective April 1, 1983, each of the defendants notified Local 541 and its individual employees that it would not make contributions to the Funds until it had entered into a new agreement with Local 541, and that it would pay the amount of the contribution ($1.50 per hour to the Pension Fund and $1.25 per hour to the Health and Welfare Fund) directly to its employees. Also, effective April 1, 1983, each of the defendants notified Local 541 and its employees that it was placing into effect the terms and provisions of its last written contract proposal to Local 541. The contract proposal had included the obligation and requirement to make fringe benefit contributions to the Funds. The obligation and requirement was identical to that required by each defendant's prior contract with Local 541 and by a later contract that became effective April 22, 1983.

On or about April 11, 1983, Local 541, through its attorney Michael C. Arnold, filed identical unfair labor practice charges against each of the defendants alleging that it had violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). Each charge stated:

Since on or about April 1, 1983, the above-named Association and/or Employer through its agents and/or representatives has refused to bargain in good faith with LOCAL 541 of the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, the bargaining representative of its employees, by unilaterally changing the terms and conditions of employment of its employees.

The charges against defendants were assigned case numbers 17–CA–11570–2 through 17–CA–11570–11.

Representatives of the Concrete Producers Association and of Local 541 continued their negotiations and agreed to the terms of a new contract that was effective April 22, 1983. Payments by defendants of contributions to the Funds resumed effective April 22, 1983. Payments of the contribution amounts directly to employees were discontinued effective that date.

On July 28, 1983, the Regional Director of the National Labor Relations Board issued a Consolidated Complaint and Notice of Hearing against all the defendants in this action. The Complaint alleged, in pertinent part:

8.

(a) On or about April 1, 1983, and continuing through April 22, 1983, each Respondent individually, instituted the following changes in the established wages, hour of employment and other terms and conditions of employment:

(1) Paid the $1.50 per hour pension benefits directly to the employees described above in paragraph 5 who were working for each Respondent individually during this period of time.

(2) Paid the $1.25 per hour health and welfare benefits directly to the employees described above in paragraph 5 who were working for each Respondent individually during the above period of time.

(b) Each Respondent individually engaged in the acts and conduct described above in paragraph 8(a) without prior notice to the Union and without having afforded the Union an opportunity to negotiate and bargain as the exclusive representative of Respondent's employees with respect to such acts and conduct and the effects of such acts and conduct....

9.

By the acts and conduct described above in paragraph 8, and by each of said acts, each Respondent has failed and

refused, and is failing and refusing, to bargain collectively with the representatives of its employees, and each Respondent thereby has been engaging in unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act.

The Complaint was subsequently amended in a manner not here pertinent, and the hearing was postponed until February 6, 1984.

On February 6, 1984, defendants (respondents in the N.L.R.B. proceeding) and Counsel for the General Counsel agreed upon a proposed informal settlement. Among other things, it provided that defendants would pay to the Funds an amount equal to eighty percent (80%) of the contributions that would have been paid for the period April 1, 1983, through April 22, 1983, if contributions to the Funds had not been discontinued, and that the N.L.R.B. Complaint against defendants would be withdrawn. Local 541 objected to the proposed settlement.

On February 9, 1984, the Regional Director approved the proposed settlement. On February 21, 1984, Local 541, through its attorney, filed with the General Counsel of the National Labor Relations Board an appeal from the Regional Director's approval of a settlement agreement that provided for less than one hundred percent (100%) restitution to the Funds.

On March 21, 1984, the General Counsel, through the Office of Appeals, denied the appeal filed by Local 541. The proceedings before the National Labor Relations Board have been completed.

■ It appears that the central issue in this dispute is the nature of the obligation to continue the fringe benefit payments in accordance with the terms of the terminated contract.[1] Defendants contend that no agreement existed between the parties which required contributions to be paid to the funds during the period between April 1 and April 22, 1983. Plaintiffs assert that an obligation under federal labor law will suffice to bring this action within the purview of ERISA.

Plaintiffs point to 29 U.S.C. §§ 1132 and 1145 as supporting subject matter jurisdiction. Section 1145 requires employers to comply with their promises to make fringe benefits contributions:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan on such agreement.

Section 1132 provides that a civil action may be brought to redress violations of the subchapter or the terms of the plan and provides for an award of liquidated damages, interest and attorney's fees. The question then becomes whether section 1145 pertains to contribution obligations arising under section 8(a)(5) of the NLRA.

It appears that the only reported case on point is *Laborers Health & Welfare Trust Fund v. Hess*, 594 F.Supp. 273 (N.D.Cal. 1984). In *Hess*, the court interpreted "Every employer who is obligated to make contributions ... under the terms of a collectively bargained agreement" to include employers obligated to contribute as a result of a duty under applicable labor-management relations law.

The well-researched and well-written *Hess* opinion relied on an analysis of the language, legislative history, and purpose of the statute. The court supported its holding with the following reasons:

> 1. The definition of "obligation to contribute" contained in a different title of ERISA includes obligations arising as a result of a duty under applicable labor law;

---

**1.** Plaintiffs briefly assert that, in addition to the terminated contract, an independent contract which required payment to the funds arose when defendants put into effect their last written offer. In light of the parties' stipulation that the defendants gave notice that they would not make the contributions to the funds, but would pay the amounts directly to the employees, this contention merits no further consideration.

2. The language of the statute in question refers to obligations *under the terms* of a collective bargaining agreement, and not obligations *under a collective bargaining* agreement; and

3. The purpose of the section in question was to provide a direct ERISA cause of action against an employer repudiating its pension promises.

The matter is not entirely free of doubt, and will ultimately require clarification either by Congress or a higher court. With respect for the Chief Judge of the Northern District of California, this Court, upon a consideration of the above factors, and general principles of federal labor relations law, reaches a contrary conclusion.

The 1980 amendments to Title IV of ERISA included a new subtitle dealing with special provisions for multiemployer plans. A definition was provided in that part for the term "obligation to contribute" as used in that part. For purposes of determining employer withdrawal liability, " 'obligation to contribute' means an obligation to contribute arising ... (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). Plaintiffs contend that since the subchapter of ERISA which includes section 1145 does not contain a definition of the phrase, there is no reason to believe Congress intended any different definition to be applied. Therefore, plaintiffs argue, the definition which by its terms is limited to Part 1 of Subtitle E of Title IV of ERISA should be applied to section 1145 which appears in Part 5 of Subtitle B of Title I of ERISA. Plaintiffs further point to the fact that Congress utilized the language *"under the terms of a collectively bargained agreement"* rather than "under a collective bargaining agreement" as indicative of congressional intent to include obligations arising under duties imposed by labor-management relation law.

Had Congress used the term as set out in Title IV in the disputed section, plaintiffs' first argument might be persuasive. In section 1145, however, Congress specified what kind of obligation it was protecting with the threat of liquidated damages and attorneys' fees. Plaintiffs reading of the section reads out of the statute the words "under the terms of the plan or under the terms of a collectively bargained agreement."

It is clear from the definition given in the part relating to employer withdrawal that Congress was well aware that an obligation to contribute could arise under agreements made by the parties or arise under duties imposed by labor-management relation law. Congress chose to include both types of obligations in determining withdrawal liability, but chose to create a cause of action and provide special damages for recovery of delinquent contributions only if those contributions were due under an agreement entered into by the employer.

It is because of the clarity of the definition in Title IV that plaintiff's argument differentiating between obligations under the terms of a contract and obligations under the contract itself must fail. The Court does not accept the argument that Congress would use an ambiguous, metaphysical concept to define an obligation when it has used a crystal clear definition elsewhere in the same act. Furthermore, the language in section 1145 relates almost exactly to the first half of the definition in Title IV. That is, it relates to an *agreement* between the parties. There is no reason to think that by using language similar to § 1392(a)(1), Congress intended to include a concept covered by § 1392(a)(2).

Plaintiffs next cite the legislative history and purpose of section 1145 as supportive of their claim. Although the legislative history does not specifically address the issue raised in this case, comments by Representative Thompson and Senator Williams, primary supporters [2] of the amend-

**2.** Senator Williams was Chairman of the Senate Committee on Labor and Human Resources and floor manager of S1076, the Senate counterpart

of HR 3904, which became the Multiemployer Pension Plan Amendments Act of 1980. Similarly, Representative Thompson was Chairman

ments, tend to shed some light on the purpose of the section:

> Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plan's entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law (other than 20 U.S.C. 186). Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises....

> [T]his legislation is intended to clarify the law ... by providing a direct, unambiguous ERISA cause of action to a plan against a delinquent employer."

126 Cong.Rec. 23039 (1980) (remarks of Rep. Thompson); *id.* at 23288 (remarks of Sen. Williams).

Representative Thompson and Senator Williams also endorsed certain court decisions involving attempts to recover delinquent contributions and disapproved of the results in other cases. *See Laborers Health & Welfare Trust Fund v. Hess,* 594 F.Supp. at 280–81. In the approved cases, employers attempted to raise one or more defenses to a trust fund's claim for contributions due under a collective bargaining agreement. In each case the Court concluded that the employer was not entitled to raise the asserted defense. *See id.* In the cases specifically disapproved of, employers were allowed to raise and prevail on a defense unrelated to the employers' promise to make contributions. *See id.*

The quoted language and the references to prior cases do not evidence an intent to grant a cause of action in the circumstances involved in this case. Rather, it appears that the intent was that employers not be permitted to repudiate their *pension promises* by raising extraneous labor law defenses. That is, the employers' duty to pay contributions arising under a contract with a labor union should not be conditioned on the union's performance of its promises under the contract. That type of action can be direct, expeditious, and brought "without regard to issues which might arise under labor-management relations law." On the other hand, an action for contributions due under an application of § 8(a)(5) of the NLRA necessarily would require a determination of such labor law issues.

In the case at bar the employers never made an agreement to pay the disputed contributions. Their obligation, if any, arose not under the terms of any promise to pay, but under the application of section 8(a)(5) of the NLRA.[3]

 Section 8(a)(5) implicitly requires an employer to maintain the status quo during negotiations for a new collective bargaining agreement even though the prior agreement has come to an end. *N.L.R.B. v. Katz,* 369 U.S. 736, 743–44, 82 S.Ct. 1107, 1111–12, 8 L.Ed.2d 230 (1962). The status quo, of course, will be heavily dependent on the terms of the prior agreement. Thus it is sometimes said that the terms of the agreement "survive" the expiration of the agreement. *See e.g. Cement Masons Health & Welfare Trust Fund v. Kirkwood-Bly, Inc.,* 520 F.Supp. 942 (N.D. Cal.1981). Nonetheless, it is the status quo, and not the terms of the written contract that must be maintained. Unilateral changes of conditions without prior discussion with the union are prohibited, not because of any agreement on the employer's

---

of the House Education and Labor Committee and floor manager of HR 3904. *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 87 n. 10, 102 S.Ct. 851, 861 n. 10, 70 L.Ed.2d 833 (1982).

3. National Labor Relations Act § 8(a)(5), 29 U.S.C. § 158(a)(5):

> "It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees...."

part, but because to allow such changes would enable an employer to circumvent the duty to negotiate and frustrate the objectives of § 8(a)(5). *Katz*, at 369 U.S. 743, 82 S.Ct. 1111. Once a union has been offered a chance to negotiate on a mandatory issue, and an impasse is reached, an employer may put into effect changes which were the subject of negotiation, but which were not agreed to. When it is considered that one of the terms of the contract was the expiration date, it is clear that the 8(a)(5) status quo requirement exists *in spite of* and not because of, the literal terms of the contract.

It appears to this Court, that by imposing a minimum amount of liquidated damages and attorney's fees in addition to the amount of damages sustained plus costs, it was Congress' intent to make employers pay for the cost of a breach of their promises, not to pay additional costs for committing an unfair labor practice. When a failure to make contributions constitutes an unfair labor practice and does not fall within the 1980 amendments, there is no repudiation of any promise. The remedies for violations of the NLRA will suffice to protect and effectuate national labor policy.

Plaintiffs assert that a direct action for collection of post-contract contributions is necessary because the pension funds are required to grant pension credits for both vesting and benefit accrual purposes for all hours *worked* by employees of defendants. Plaintiffs foresee the demise of a plan if it is required to grant benefits but is precluded from collecting contributions. That issue may arise in the context of another case. It appears to this Court, however, that to the extent that contributions may be due under § 8(a)(5), and not pursuant to an agreement, the plans are, in a sense, gratuitous beneficiaries of the national policy favoring negotiation. If contributions are ordered paid in an action by the N.L. R.B., the hours worked giving rise to those contributions can be counted toward benefit rights. If no contributions are collected because there was no unfair labor practice or because the General Counsel of the N.L. R.B. determines that prosecution of the case would not effectuate the purposes of the NLRA, then the funds, and ultimately the employees, have lost nothing to which they were entitled under any agreement with the employers.

Plaintiffs cite *Robbins v. Prosser's Moving and Storage Co.*, 700 F.2d 433 (8th Cir.1983), as authority for the proposition that the fact that the Funds are powerless to initiate enforcement under the NLRA compels a finding of subject matter jurisdiction under the 1980 amendments. *Robbins* did note that the interests of the Funds and the interests of the unions they serve will not always be in harmony. *Id.* at 442. The question in *Robbins*, however, was whether an arbitration clause in an agreement between a union and an employer could be used as a procedural defense in an action to collect contributions due under the agreement.[4] The court held that the Union's agreement could not foreclose the Funds' cause of action in federal court. The question here is whether the cause of action exists.

In this case, any right to post-termination contributions that the Funds may have arises solely under the laws governing labor-management relations which are designed to protect the process of negotiation. Those laws provide a specific and detailed procedure designed by Congress to balance the conflicting legitimate interests involved in effectuating national labor policy. It does not appear that Congress, in creating a specific cause of action with enhanced damage provisions for breach of promises to contribute, intended to add protections to the process of negotiation by providing a cause of action with enhanced penalties for commission of an unfair labor

4. Jurisdiction was alleged under § 301 of LMRA, 29 U.S.C. § 185(a) and § 502 of ERISA, 29 U.S.C. § 1132.

practice. Defendants' motion to dismiss will be granted.

■ Defendants also have moved for an award of attorneys' fees under 29 U.S.C. § 1132(g)(1) which provides:

In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

Plaintiffs argue that if the motion to dismiss for lack of jurisdiction is granted, this Court would be without jurisdiction to award fees under the above quoted statute. Plaintiffs cite no authority for this proposition. Plaintiffs also argue that an award of fees in this type of action expressly is excluded from the language of § 1132(g)(1). Because of the circumstances under which this case was brought, the Court finds that these issues need not be addressed in this case. There is nothing to indicate that plaintiffs brought this action in bad faith, nor that an award of fees would deter others from doing likewise. The plaintiffs brought the case for the benefit of its participants and beneficiaries under a perceived duty to do so and to resolve a significant legal question regarding ERISA. In such a case, the court finds that an award of fees would be improper.

Accordingly, it is hereby ORDERED:

1) Defendants' motion for attorneys' fees is denied; and

2) Defendants' motion to dismiss is granted, the parties to bear their own costs.