760 F.2d 1474
 119 L.R.R.M. (BNA) 2325, 37 Fair
Empl.Prac.Cas. 1092,
36 Empl. Prac. Dec. P 35,159, 1 A.D. Cases 737
 Joseph D'AMATO, Plaintiff-Appellant,
v.
WISCONSIN GAS COMPANY, Ellen Shong, Director, Office of
Federal Contract Compliance Programs, and Peter M. Sliva,
Area Office Director, Office of Federal Contract Compliance
Programs, Defendants-Appellees,
and
Oil, Chemical and Atomic Workers International Union,
AFL-CIO, Local 6-18, Party of Interest.
 No. 83-3235.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 11, 1985.
Decided April 25, 1985.
 
 Kenneth R. Loebel, Habush, Habush & Davis, S.C., Milwaukee, Wis., for plaintiff-appellant.
 Stanley S. Jaspan, Foley & Lardner, Milwaukee, Wis., Jay D. Adelstein, U.S. Dept. of Labor, Washington, D.C., for defendants-appellees.
 Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and PELL, Senior Circuit Judge.
 CUMMINGS, Chief Judge.
 
 
 1
 Plaintiff Joseph D'Amato appeals from the district court's dismissal of his complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief can be granted. For the reasons stated herein, we affirm the lower court.
 
 
 2
 * Plaintiff's factual allegations, which we take as true for the purposes of a Rule 12(b)(6) motion, are as follows. Defendant Wisconsin Gas Company (the "Company") hired D'Amato on April 23, 1980, as an Office Services Clerk B. This job required the plaintiff to go into tall buildings, a requirement he had difficulty meeting because he suffers from acrophobia. He discussed the problem with his supervisor, who advised him that he could either resign or be fired. On July 11, 1980, he chose to resign. On July 23 the Company offered him a position as meter reader, a position that would not require him to go into high places. But on the next day the Company withdrew its offer, informing D'Amato that its policy against rehiring employees who had quit or been fired prevented its rehiring him.
 
 
 3
 On January 26, 1981, D'Amato initiated this administrative complaint with the Milwaukee Area Office of Federal Contract Compliance Programs ("OFCCP") headed by defendant Peter Sliva. The complaint alleged that the Company discriminated against D'Amato through its no-rehire policy. On April 1, 1982, the OFCCP notified D'Amato that it agreed with his allegations of discrimination, and it instituted voluntary conciliation efforts with the Company.
 
 
 4
 On July 20, 1982, while these discussions were ongoing, the Company made D'Amato an unconditional offer of employment as meter reader, explaining that it had eliminated its no-rehire policy. The plaintiff accepted the offer and began work on August 2, 1982. The collective bargaining agreement (the "Agreement") governing plaintiff's work provided a probationary period of sixty days, after which the Company could dismiss an employee only for proper cause. During the probationary period the Company could terminate an employee without cause. On September 29, 1982, the fifty-eighth day of D'Amato's employment, the Company informed him that he had not performed his job "satisfactorily" and that the Company was therefore terminating him effective that day (App. 30).
 
 
 5
 Subsequent to this termination the Company consummated a conciliation agreement with OFCCP providing, among other things, that plaintiff would be entitled to seniority dating back to July 24, 1980, "assuming his completion of a 60-day probationary period" (App. 31). This agreement was a sham, for the Company knew it had already terminated D'Amato, thus assuring it would never have to fulfill any of the obligations set forth in the conciliation agreement. On October 8, 1982, Sliva wrote D'Amato to inform him of the proposed conciliation agreement and that the agreement would be forwarded to a "higher agency authority" for review and approval "before a final offer can be made" (id.).
 
 
 6
 Thereafter plaintiff has tried repeatedly to learn the status of his case. Not until April 1, 1983, in an affidavit filed in the current suit, did he receive information regarding the status of the administrative proceeding. The case has now been referred by the OFCCP to the Regional Solicitor of the Department of Labor ("DOL") for enforcement, and an administrative complaint has been issued against the Company. That complaint is styled Office of Federal Contract Compliance Programs, U.S. Department of Labor v. Wisconsin Gas Company, Case No. 84-OFCCP-9, and is pending before DOL's Office of Administrative Law Judges.
 
 
 7
 On January 24, 1983, plaintiff filed the instant suit against the Company, the Oil, Chemical and Atomic Workers, International Union, Local 6-18 (the "Union"), and two federal employees. His four-count complaint alleged (1) the Company violated Section 503 of the Rehabilitation Act, 29 U.S.C. Sec. 793 (the "Act"),[1] in connection with its termination of his employment on July 24, 1980; (2) the Company wrongfully discharged him on September 29, 1982, in violation of federal common law; (3) the Company conspired with Sliva and Ellen Shong, then Director of OFCCP, to deprive D'Amato of his rights as a handicapped individual in violation of 42 U.S.C. Secs. 1985(3) and 1986; and (4) the Company breached its collective bargaining agreement with the Union in discharging D'Amato on September 29, 1982. The district court granted defendants' motions to dismiss on November 16, 1983, and plaintiff filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 II
 
 8
 Section 503(a) of the Rehabilitation Act requires companies with government contracts exceeding $2,500 for the procurement of personal property and nonpersonal services to include an affirmative action provision in their contracts.[2] Plaintiff's first count asserts a claim as a third-party beneficiary of this affirmative action provision.[3] See Plaintiff's Br. 11. Thus plaintiff seeks to avoid the well-settled rule in this Circuit that no private right of action arises under Section 503. Ernst v. Indiana Bell Telephone Co., 717 F.2d 1036, 1037 (1983); Simpson v. Reynolds Metals Co., 629 F.2d 1226 (1980).[4] We hold that plaintiff's Count I fails.
 
 
 9
 This case concededly implicates federal common law (Plaintiff's Br. 11) rather than state common law, because rights allegedly arising out of a federal statute are at issue. The Supreme Court concluded in Illinois v. City of Milwaukee, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 "that Sec. 1331 [federal question] jurisdiction will support claims founded upon federal common law as well as those of a statutory origin." The Court recognized that "the remedies which Congress provides are not necessarily the only federal remedies available. 'It is not uncommon for federal courts to fashion federal law where federal rights are concerned.' " Id. at 103, 92 S.Ct. at 1392 (quoting Textile Workers v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972). Therefore the situation is quite different from that in Miree v. DeKalb County, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557. In Miree, a case founded on the federal court's diversity jurisdiction under 28 U.S.C. Sec. 1332, the Court held that federal common law would not be applied where the United States was not a party, no financial obligation of the United States was affected, and no paramount federal interest was at stake. Id. at 28-32, 97 S.Ct. at 2493-95. This analysis is inapplicable to a case dependent in the first instance on federal common law.
 
 
 10
 Consequently, the Eleventh Circuit's opinion in Howard v. Uniroyal, Inc., 719 F.2d 1552 (1983), has no direct relevance. Howard involved a third-party beneficiary claim allegedly arising under state law, a claim that the Eleventh Circuit found preempted by the administrative enforcement scheme Congress enacted in Section 503, discussed infra. Preemption analysis is distinct from determining whether the federal common law would furnish a remedy in addition to that contained in the federal statute. Nonetheless, the Eleventh Circuit's conclusion that the pervasive federal scheme of administrative enforcement barred state law third-party beneficiary claims, id. at 1559-1560, that themselves "present[ed] a serious danger of conflict with the administration of the federal program," id. at 1561, accords with the one we reach here concerning federal third-party beneficiary claims.
 
 
 11
 The Restatement (Second) of Contracts provides the relevant criteria with regard to Count I. Section 302(1) provides in relevant part that "[u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." Restatement (Second) of Contracts Sec. 302(1) (1981). Section 313 deals specifically with government contracts, and it provides in relevant part that the "rules stated in this Chapter apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach." Id. Sec. 313(1).
 
 
 12
 Ascertainment of the intent of the parties and the purposes underlying both the Company's federal contracts and Section 503 is thereby central to the inquiry. D'Amato would have enforceable rights under the Company's government contracts if they were "made for his direct benefit. * * * If the agreement was not intended to benefit the third party, however, he is viewed as an 'incidental' beneficiary, having no legally cognizable rights under the contract." Holbrook v. Pitt, 643 F.2d 1261, 1270 (7th Cir.1981) (citations and footnote omitted). Plaintiff argues that because the affirmative action clauses benefit the handicapped, the handicapped are direct beneficiaries and therefore entitled to sue. This analysis is overly simplistic. The question is not whether the contracts would benefit the handicapped, but whether the parties intended to confer an actionable right on the handicapped.
 
 
 13
 The tenor of the contracts suggests that the parties did not intend to make the handicapped direct beneficiaries of their contracts. The contracts are not directed at the handicapped in any way but instead focus exclusively on the government-contractor relationship. Thus our decisions in Holbrook, supra, and EEOC v. Liberty Trucking Co., 695 F.2d 1038 (7th Cir.1982), do not lend D'Amato the support he claims. Holbrook involved Section 8 of the United States Housing Act of 1937, 42 U.S.C. Sec. 1437f, under which the Department of Housing and Urban Development contracts with certain housing project owners to make rental assistance payments on behalf of eligible low-income tenants. We held that these tenants were third-party beneficiaries of the contracts the government made on their behalf. Liberty Trucking held that the Equal Employment Opportunity Commission ("EEOC") could bring suit directly under Title VII of the Civil Rights Act of 1964 for breach of a conciliation agreement an employer had signed. In both cases the needs of the third party motivated the government to enter into the contract in the first place. The Company's contracts, on the other hand, are not designed to serve the interests of the handicapped. They merely require the Company to take affirmative action as a promise incidental to a contract to provide goods and services.[5] That the main purpose is unrelated to the affirmative action clauses indicates that the handicapped may not sue as third-party beneficiaries.
 
 
 14
 The statutory language and structure buttress this conclusion. The Supreme Court observed in Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560, that far less cause exists to infer a private remedy when the statutory language does not unequivocally focus on the benefitted class in their right but instead operates "simply as a ban on discriminatory conduct." Id. at 691-692, 99 S.Ct. at 1955. The same analysis applies in determining whether Congress intended to create third-party beneficiary rights in the handicapped. As has been noted in another context:
 
 
 15
 The statute [Section 503] does not confer a clearly defined right on the benefitted class. There is no intimation that every qualified handicapped person has a right to affirmative action in his particular case; what is apparent is that those who control federal contracts have a duty to make and enforce contracts containing the requisite clause. The handicapped may have simply the right to petition those who administer federal contracts to perform their duty.
 
 
 16
 Rogers v. Frito-Lay, Inc., 611 F.2d at 1079-1080.[6]
 
 
 17
 In this regard, Section 504 of the Rehabilitation Act, 29 U.S.C. Sec. 794, provides an instructive contrast.[7] That Section, like Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 upon which it was modeled, does focus directly on the disadvantaged individual, providing that "[n]o otherwise qualified handicapped individual * * * shall * * * be excluded." Not only does this language suggest the creation of a right of enforcement in third parties, but Congress expressly so stated in the Senate report accompanying the 1974 amendments to the Act. See S.Rep. No. 1297, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 6373, 6391. Section 504 illustrates the circumstances under which a court appropriately may infer a private cause of action, circumstances that are absent under Section 503.[8]
 
 
 18
 Congress' division of responsibility for the enforcement of Sections 503 and 504 provides another clue to Congressional intent. While DOL is responsible for implementing Section 503, Congress delegated to the Department of Health, Education and Welfare ("HEW") the responsibility for enforcing Section 504.[9] HEW was the agency charged with enforcing Titles VI and IX, which the Supreme Court has determined permit private causes of action. See Cannon, 441 U.S. at 694-703, 99 S.Ct. at 1956-1961 and accompanying notes. Thus HEW, now the Department of Education, would be better equipped to enforce Section 504, while DOL could enforce Section 503, which allows no private remedy.
 
 
 19
 The availability of an administrative remedy under Section 503 indicates another significant difference between the two statutory provisions. No such remedy is available under Section 504. The statutory grant of one remedy under Section 503 without mention of any other action implies that Congress intended to bar other remedies. See National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 ("when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies"). Of course, "clear contrary evidence of legislative intent," id., would overthrow this implication.
 
 
 20
 Examination of the rules and regulations implementing the statute provides a further indication that no right to sue as a third-party beneficiary exists. These provisions are entitled to weight as promulgations by the agency charged with enforcing the statute. The regulations detail the procedures DOL must follow in implementing Section 503, and they provide that "the matter should be resolved by informal means, including conciliation, and persuasion, whenever possible." 41 C.F.R. Sec. 60-741.28(a) (1984). Courts that have considered the question closely have concluded that private suits would interfere seriously with the government's efforts to achieve conciliation. See Meyerson v. Arizona, 709 F.2d 1235, 1240 (9th Cir.1983), vacated and remanded on other grounds, --- U.S. ----, 104 S.Ct. 1584, 80 L.Ed.2d 118;[10] Fisher v. City of Tucson, 663 F.2d at 865-867; Davis v. United Air Lines, Inc., 575 F.Supp. at 680; Anderson v. Erie Lackawanna Railway, 468 F.Supp. 934, 939 (N.D.Ohio 1979). Congress' emphasis on conciliation and informal resolution of complaints suggests strongly that it did not intend a conflicting private remedy arising out of the affirmative action clauses to be available. To conclude otherwise would mean Congress had purposefully established an elaborate administrative procedure whose effectiveness Congress intended to be undermined willy-nilly through the institution of private lawsuits.
 
 
 21
 The one reference in the regulations to judicial action indicates no private remedy of any sort is available. The regulations permit the Director of the OFCCP, charged with enforcing compliance, "[i]n addition to the administrative remedies set forth herein," to "seek appropriate judicial action to enforce the contractual provisions set forth in Sec. 60-741.4 including appropriate injunctive relief." 41 C.F.R. Sec. 60-741.28(b) (1984). This failure to mention any concomitant private action indicates to us that no such private action was intended. We note also that id. Sec. 60-741.32 states that "[t]he procedures set forth in the regulations in this part govern all disputes relative to a contractor's compliance with the affirmative action clause and the requirements of this part." Because the regulations do not allude to third-party actions, this remedy appears to be barred. Admittedly this evidence does not rise to the level of contemporary legislative history, discussed infra. Nevertheless, it is due deference and militates against allowing D'Amato's claim to stand.
 
 
 22
 Unfortunately, the legislative history accompanying Section 503 is sparse. Congress enacted the Section as a miscellaneous provision, and Congressional attention centered on other provisions of the Act that instituted federal research and training programs to benefit the handicapped. See Simpson, 629 F.2d at 1240-1241. More fruitful is the legislative history accompanying the 1974 amendments to the Act. The potential for conflict between DOL and HEW (now the Department of Education) in enforcing Sections 503 and 504 evidently concerned Congress. Immediately after stating that Section 504 would "permit a judicial remedy through a private action," S.Rep. No. 1297, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 6373, 6391, the Senate Committee on Labor and Public Welfare devoted an entire paragraph to stressing the need for the two agencies to "cooperate in developing standards and policies so that there is a uniform, consistent Federal approach to these sections." Id. By insisting that enforcement efforts be coordinated, Congress did not mean "that identical methods of enforcement were envisioned," but rather "that the two responsible agencies were not to work at cross purposes or to duplicate each other's efforts." Anderson, 468 F.Supp. at 939. See Simpson, 629 F.2d at 1241.
 
 
 23
 D'Amato's strongest support comes from the enactment in 1978 of Section 505, 29 U.S.C. Sec. 794a, allowing a court to award attorneys' fees to prevailing private parties.[11] The Senate report did state that "the availability of attorney's fees should assist in vindicating private rights of action in the case of section 502 and 503 cases, as well as those arising under section 501 and 504." S.Rep. No. 890, 95th Cong., 2d Sess. 19 (1978), quoted in Simpson, 629 F.2d at 1242. The House report explained more generally that the "new section permits courts, at their discretion, to award to the prevailing party, other than the United States, in any action or proceeding to enforce sections 501, 503 or 504 of the act, a reasonable allowance to cover the costs of attorneys' fees." H.Rep. No. 1149, 95th Cong., 2d Sess. 21, reprinted in 1978 U.S.Code Cong. & Admin.News 7312, 7332. The House conference report noted that the Senate version provided that attorneys' fees were available "in any action or proceeding to enforce or charge a violation of a provision of title V [containing Sections 501-507 of the Rehabilitation Act]." H.Conf.Rep. No. 1780, 95th Cong., 2d Sess. 93, reprinted in 1978 U.S.Code Cong. & Admin.News 7375, 7404. Similarly remarks made on the floor reflected the need to facilitate private enforcement of title V through the provision of attorneys' fees. See, e.g., 124 Cong. Rec. 30349 (1978) (remarks of Sen. Cranston) (co-sponsor); id. at 30346-30347 (remarks of Sen. Stafford) (co-sponsor).
 
 
 24
 Insofar as these scattered references refer to title V generally, they do not contradict the interpretation we adopt. Such general and ambiguous references could be referring to the private right of action concededly available under Sections 501 and 504. We indicated in Simpson, supra, that they might also refer to the institution of administrative proceedings under Section 503, including participation in judicial proceedings instituted by the Director of the OFCCP. Simpson, 629 F.2d at 1242. Reasoning by analogy from Executive Order No. 11246, whose rules of practice for hearings apply to Section 503 through 41 C.F.R. Sec. 60-741.29(b) (1984), the Second Circuit concluded that judicial appeal would be available under the Administrative Procedure Act, 5 U.S.C. Secs. 701-706, should D'Amato feel aggrieved at the conclusion of the administrative proceedings. Davis, 662 F.2d at 126.
 
 
 25
 The Senate report first cited does weigh against the reading we give the statute. But subsequent legislative history does not have the same convincing weight as contemporaneous legislative history. Cannon, 441 U.S. at 686 n. 7, 99 S.Ct. at 1952 n. 7. The language cited was also merely an assumption of what Congress had done five years earlier, Simpson, 629 F.2d at 1243, and certainly did not purport to amend the statute. See Rogers, 611 F.2d at 1082 ("if the 1973 statute did not authorize the cause of action, the 1978 statute evidences no intention to create one"). Even though the assumption was made by Congress, it "cannot be relied upon as a faithful indicator of prior congressional intent." Simpson, 629 F.2d at 1243. The Second Circuit observed that the failure of the 1978 Congress to note conflicting case law regarding the availability of private causes of action under Section 503 evidences that the reference to Section 503 was inadvertent. Davis, 662 F.2d at 125. The context in which the reference in the Senate report arose supported this conclusion. Id. This evidence, standing alone, provides too slight an indication of Congressional intent for us to infer Congress meant to authorize private federal remedies in addition to the administrative one expressly allowed.
 
 
 26
 Given the differences in wording and function between Sections 503 and 504, the administrative scheme of regulation with which private suits would interfere, and the very different tenor of the Section 503 contracts from a garden-variety third-party beneficiary situation, we conclude that Congress intended that the administrative scheme be the sole avenue of redress for the handicapped. D'Amato's claim as a third-party beneficiary therefore must fail.[12]
 
 III
 
 27
 Count II of plaintiff's complaint alleges a claim of wrongful discharge arising out of the Company's firing him on September 29, 1982. As in Count I, D'Amato bases his claim on federal law.[13] Like his third-party beneficiary claim, this allegation too reduces to an attempt to institute a private cause of action under Section 503 and so fails for similar reasons.
 
 
 28
 The 1964 Civil Rights Act Title VII cases on which plaintiff relies are inapposite. See Liberty Trucking, supra; Perdue v. Roy Stone Transfer Corp., 690 F.2d 1091 (4th Cir.1982); Ferguson v. Flying Tiger Line, Inc., 688 F.2d 1320 (9th Cir.1982). Title VII, unlike Section 503, authorizes an express private right of action. Allowing a tort action in that situation poses no possibility of a plaintiff's end-run around an exclusive administrative remedy such as the one Congress provided under Section 503. Moreover, these three cases involved conciliation agreements, whereas in the instant situation the Company has yet to assume the commitment embodied in an employer's signing a conciliation agreement.[14] Obviously a conciliation agreement, involving the grieved employee directly, differs radically from the affirmative action clauses D'Amato alleges generate the rights he claims.
 
 
 29
 If D'Amato believed the Company acted intentionally in bad faith, he could have instituted a second administrative proceeding. Alternatively, he may yet be able to introduce evidence on the matter in a judicial proceeding following any administrative order that might issue at the conclusion of the administrative proceedings.[15] D'Amato complains of the long delay he has already suffered, and the additional long delay these two alternatives would cause him. We sympathize with his frustration, but the possibility of delay cannot create a remedy that Congress barred.
 
 
 30
 Nor does Ford Motor Co. v. EEOC, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721, provide D'Amato any support. That case held that an employer's offering an employee an unconditional offer of employment would toll any further accrual of backpay in Title VII proceedings. D'Amato argues that this case required him to accept the Company's offer, regardless of its intention to discharge him before the completion of the probationary period, in order to preserve his claims in the OFCCP proceeding. Even assuming that this case did in fact operate to force D'Amato to accept the Company's offer, his doing so in no way prejudices his ultimately receiving any seniority to which he may be entitled that had accrued prior to the employment offer. The Supreme Court made clear in Ford Motor Co. that the Title VII proceedings were independent of whether or not the aggrieved employee accepted an employer's unconditional job offer, except for the calculation of damages. Id. at 232-234, 102 S.Ct. at 3066-3067.
 
 
 31
 More importantly, we see no reason why D'Amato could not, assuming he offered sufficient proof of the Company's bad intentions when it made him the July offer, ultimately recover seniority accruing after the employment offer, as if the employment offer had not been made. But the proper place to bring such allegations is in the administrative proceeding that will ultimately determine what recovery, if any, D'Amato may receive. Instituting a separate judicial action concerning events properly the province of the administrative proceeding is at best profligate with scarce judicial resources. Our analysis under Count I indicated that Congress did not mean to permit private parties to bring suit, due to the interference with the administrative proceedings such actions would cause. To the extent that Congress intended the administrative action to be the sole one available to individual employees, we lack power to countenance D'Amato's claims.
 
 IV
 
 32
 D'Amato bases his third count on 42 U.S.C. Sec. 1985(3).[16] His complaint alleges that Shong and Sliva conspired with the Company to deny him effective administrative review of the complaint he filed with the OFCCP. D'Amato bases his claim on the long delay experienced in the processing of his complaint, and on Sliva's evident readiness to accept the Company's worthless proposed conciliation agreement that would take effect only if D'Amato successfully completed a probationary period the Company had already determined he would not complete.
 
 
 33
 In order to recover under Section 1985(3), a plaintiff must establish that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" exists. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338. Section 1985(3) was a part of the Civil Rights Act of 1871; its "predominate purpose * * * was to combat the prevalent animus against Negroes and their supporters." United Brotherhood of Carpenters and Joiners of America Local 610 v. Scott, 463 U.S. 825, 836, ----, 103 S.Ct. 3352, 3359, 77 L.Ed.2d 1049. D'Amato cannot meet this requirement of class-based invidiously discriminatory animus.
 
 
 34
 The legislative history of the statute has caused the Supreme Court to read its requirements of class-based, invidious animus strictly, an approach the Court reaffirmed in Scott by holding that commercial and economic animus could not form the basis of a Section 1985(3) claim. Section 1985(3) as originally proposed was much broader than its present wording and was narrowed to its current form in response to congressional concern that as first written it constituted a "general federal tort law." Griffin, 403 U.S. at 102, 91 S.Ct. at 1798. The Court in Scott acknowledged that some of this earlier legislative history supported an expansive reading of the statute. Scott, 463 U.S. at 836, 103 S.Ct. at 3360. The Court noted that, significantly, this legislative history had also been before the Supreme Court when it had decided Griffin, supra, and introduced the class-based and invidious discrimination requirements. Nevertheless the Court then had
 
 
 35
 still withheld judgment on the question whether Sec. 1985(3), as enacted, went any farther than its central concern--combating the violent and other efforts of the Klan and its allies to resist and to frustrate the intended affects of the Thirteenth, Fourteenth and Fifteenth Amendments. Lacking other evidence of congressional intention, we follow the same course here.
 
 
 36
 Scott, 463 U.S. at 837, 103 S.Ct. at 3360.
 
 
 37
 This history counsels that we likewise interpret the statute carefully, to be sure the scope of Congressional intention is not exceeded. Our doing so convinces us that the employment discrimination here alleged is outside the scope of Section 1985(3).
 
 
 38
 The legislative history of Section 1985(3) does not suggest a concern for the handicapped. The handicapped as a class differ radically from the racially-based animus motivating the Ku Klux Klan and white supremacists against which Congress directed Section 1985(3). Handicaps vary greatly from immediately noticeable physical handicaps to ones not at first obvious or those revealed only by a medical examination. Handicaps are also a condition that may be overcome, depending on the individual and on the handicap; likewise the severity with which a handicap affects a person varies from individual to individual. Being handicapped is not a historically suspect class such as race, national origin, or sex, nor is the right claimed, employment, a fundamental Constitutional right. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (sex); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (alienage); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (race); Koelfgen v. Jackson, 355 F.Supp. 243, 250 (D.Minn.1972), affirmed, 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (mem.) (employment not a fundamental right). Thus handicaps differ significantly from classes based on race, ethnic origin, sex, religion and political loyalty that have previously been recognized as possibly supporting a Section 1985(3) claim. Askew v. Bloemker, 548 F.2d 673, 678 (7th Cir.1976); Murphy v. Mt. Carmel High School, 543 F.2d 1189, 1192 n. 1 (7th Cir.1976).
 
 
 39
 Most importantly for a Section 1985(3) analysis, handicaps can be legitimate reasons for exclusion from some jobs--unlike discrimination based on race, ethnic origin, sex, religion or politics.[17] This distinction renders such discrimination less invidious. The Tenth Circuit, when presented with the question of Section 1985(3) liability for handicap discrimination, replied that the Supreme Court in Scott, supra, and Griffin, supra, had distinguished the rights and privileges that Section 1985(3) protects, which "with the constitutional overtones are to be construed broadly," from "the classes or groups to be protected [which] are instead to be derived from statutory construction." Wilhelm v. Continental Title Co., 720 F.2d 1173, 1177 (10th Cir.1983), certiorari denied, --- U.S. ----, 104 S.Ct. 1601, 80 L.Ed.2d 131. The genesis of Section 1985(3) out of racial conflict and the Reconstruction Era convinced the Tenth Circuit "that a class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now Sec. 1985(3)." Id. Accord Corkery v. SuperX Drug Corp., 36 Fair Empl.Prac.Cas. 1815 (M.D.Fla.1985) (relying on Wilhelm). Allowing the instant litigation to continue would conflict with the Congressional purpose underlying Section 1985.
 
 
 40
 The Supreme Court's conclusion in Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 supports our decision here. In Novotny, the plaintiff was attempting to assert a Title VII claim through Section 1985(3). The Court was concerned that allowing this type of action would circumvent the detailed limits in Title VII on a plaintiff's private right of action, especially the requirements designed to encourage voluntary compliance. The Court pointed out that "[p]erhaps most importantly, the complainant could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII." Id. at 376, 99 S.Ct. at 2351. Consequently the claim could not stand.
 
 
 41
 Similarly Section 503 provides its own administrative remedy. Unlike Title VII, no private right of action is available and the administrative complaint is the only recourse available to a private plaintiff. This situation makes the allowance of an action under Section 1985(3), which would avoid entirely the administrative procedures provided in Section 503(b) and its accompanying regulations, even more suspect as a breach of the Congressional intent underlying Section 503 than it was in Novotny. The Court justified its position in Novotny by remarking:
 
 
 42
 Section 1985(3), by contrast, creates no rights. It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right--to equal protection of the laws or equal privileges and immunities under the laws--is breached by a conspiracy in the manner defined by the section. Thus, we are not faced in this case with a question of implied repeal. The right Novotny claims under Sec. 704(a) did not even arguably exist before the passage of Title VII. The only question here, therefore, is whether the rights created by Title VII may be asserted within the remedial framework of Sec. 1985(3).
 
 
 43
 Id. at 376-377, 99 S.Ct. at 2351 (emphasis in original).
 
 
 44
 Certainly the right to employment that D'Amato claims did not exist prior to the enactment of Section 503. This right is more akin to the economic rights at issue in Scott, supra, than to the race-based concerns traditionally afforded protection by Section 1985(3). D'Amato has other remedies available through his Section 503 administrative complaint and his state law claims against the Company. Allowing D'Amato to pursue his claim through the mechanism of Section 1985(3) would impermissibly intrude on the statutory scheme of both Sections 503 and 1985(3).[18]V
 
 
 45
 D'Amato's final claim alleges that the Company violated the collective bargaining agreement between it and the Union by offering employment to D'Amato while intending to terminate him during the probationary period before the good cause termination clause in the Agreement applied.[19]
 
 
 46
 Before D'Amato may institute court action, he must exhaust the grievance and arbitration provisions contained in the bargaining agreement, as long as those provisions are intended to constitute the exclusive remedy for breach of contract claims. Vaca v. Sipes, 386 U.S. 171, 184, 87 S.Ct. 903, 913, 17 L.Ed.2d 842. The contract in issue here contains such exclusive grievance procedures (Doc. 11, Ex. A, Art. VII, Sec. 1). D'Amato's admitted failure to "at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement," Vaca, 386 U.S. at 184, 87 S.Ct. at 914, bars his claim.
 
 
 47
 D'Amato seeks to avoid the consequences of the general rule by claiming he falls within one of several exceptions. The first exception is a situation in which "the conduct of the employer amounts to a repudiation of those contractual procedures," id. at 185, 87 S.Ct. at 914, so that the employer "is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action." Id. Plaintiff's complaint asserts that the "Defendant Employer purposefully precluded the Plaintiff from effectively obtaining any redress under the grievance arbitration provisions of the labor contract" (App. 23). But all the Company did was fire D'Amato; it took no steps that would have precluded him from grieving his dismissal. Since the Company took no steps to frustrate the processing of such a complaint, D'Amato cannot claim this exception.
 
 
 48
 D'Amato next contends that the futility exception to the exhaustion doctrine applies. If resort to the grievance procedures provided would be wholly futile, as it would be where those who would pass on the claims are the very individuals charged with violating the complaining employee's rights initially, then "no time-consuming formalities should be demanded." Glover v. St. Louis-San Francisco Railway, 393 U.S. 324, 331, 89 S.Ct. 548, 552, 21 L.Ed.2d 519. Glover involved racial discrimination by both company and union officials; the Court held that "the attempt to exhaust contractual remedies" required by law was "easily satisfied by petitioners' repeated complaints to company and union officials." Id. (emphasis in original). D'Amato has not complained to the Union of his treatment, and has made no attempt to enlist its support in grieving his dismissal against the Company. Consequently he has not demonstrated that initiation of formal grievance procedures would be futile.
 
 
 49
 D'Amato argues that his probationary status relieved the Union of any duty to represent him. This argument is specious. We were informed at oral argument that formal induction into Union membership is unnecessary, and D'Amato has provided no authority to the contrary. Furthermore, after thirty days Union dues were deducted from his paycheck, indicating that he was indeed a member of the Union. The bargaining agreement obligates "the Union or its members" (Doc. 11, Ex. A, Art. VII, Sec. 1) to use the prescribed contractual grievance procedure to resolve differences. In these circumstances probationary employees who are union members are entitled to use, indeed must use, the established grievance procedure to resolve complaints. Accord Amoco Oil Co., 70 Lab.Arb. Awards 979 (1978) (allowing a probationary employee to grieve his discharge); Standard Oil Co. of California, 38 Lab.Arb. Awards 350 (1962) (same).
 
 
 50
 D'Amato has established no facts that would indicate that the Union would breach its duty of fair representation to him. Admittedly the Union had no obligation to attempt to gain for him the seniority that was the subject of his administrative complaint with the OFCCP. Moreover, D'Amato's likelihood of prevailing on his discharge claim, given his probationary status, was weak, for the Agreement requires that only Union members who have successfully completed the sixty-day probationary period may be dismissed solely for good cause. Nonetheless, the contract may very well contain a minimum good faith requirement, especially in the circumstances D'Amato claims, in which the Company hired him while intending from the outset that he would not complete the probationary period. See Standard Oil Co. of California, 38 Lab.Arb. Awards at 351-352 ("To be sure, the right to terminate an employee during his probationary period is not unlimited; it must not be exercised in an arbitrary, capricious or discriminatory fashion. Obviously this is less than requiring 'just cause' for termination or else a probationary period would have no significance.").
 
 
 51
 Raising this good faith defense to the dismissal falls squarely within the Union's duty to D'Amato. Although the defense implicates facts prior to D'Amato's August 1982 employment with the Company, in and of itself it would not gain for D'Amato the seniority he was pursuing in the administrative complaint. The administrative proceedings are independent of any instituted under the bargaining agreement. A labor union's representing one employee when that representation in a literal sense would disadvantage other members does not necessarily imply that the union will choose to breach its duty to the aggrieved member. For instance, anytime an employer discharges an employee, reinstatement would disadvantage other employees who had been junior in status to the discharged employee but had not themselves been fired. Yet that nascent conflict does not relieve the wronged employee of the duty to exhaust exclusive contractual procedures, absent some concrete proof that the union would ignore its obligations.
 
 
 52
 The same principle applies here, where D'Amato's reinstatement might have ultimately resulted in his receiving two years' seniority due to the entirely independent administrative proceedings. The Union has a duty to represent D'Amato fairly, and plaintiff has pointed to no circumstances that would convince us the Union would do otherwise.[20] D'Amato's failure to attempt to exhaust the grievance procedures provided in the collective bargaining agreement precludes his fourth claim.[21]VI
 
 
 53
 In summary, we have found that D'Amato cannot prevail on any of his four claims. The exclusive administrative remedy provided in Section 503(b) and its accompanying regulations bar D'Amato's third-party beneficiary contract claim. Congress never intended to afford a private judicial remedy to the handicapped that might interfere with the administrative scheme over which DOL presides, thus precluding D'Amato from claiming intended beneficiary status. We reiterate that the Administrative Procedure Act, 5 U.S.C. Secs. 701-706, seemingly authorizes D'Amato to appeal the ongoing administrative proceedings once they have concluded, should he still feel aggrieved at that point. D'Amato has also informed us he is currently pursuing state administrative remedies for discrimination against the handicapped.
 
 
 54
 Congress' institution of an exclusive administrative remedy similarly precludes D'Amato's attempted assertion of a federal common law tort action for wrongful discharge. Again, the facts D'Amato alleges under this count might be relevant in judicial proceedings appealing DOL's administrative disposition of the matter. Section 1985(3) is unavailable because D'Amato cannot establish the requisite invidious discriminatory animus, an animus Congress intended to link closely to racial bias and violations of the Thirteenth, Fourteenth, and Fifteenth Amendments. D'Amato's final claim under the collective bargaining agreement between the Company and the Union is barred by D'Amato's complete failure to exhaust the exclusive contractual remedies provided, or to attempt to do so.
 
 
 55
 The alternatives for redress that continue to be available mitigate the otherwise harsh result we reach. Even were no such alternatives available, we cannot countenance remedies Congress intended to exclude. Since D'Amato is unable to establish a set of facts to remedy any of the defects we cite, the district court's dismissal of the lawsuit for failure to state a claim for which relief can be granted is affirmed.[22]
 
 
 
 [1]
 29 U.S.C. Sec. 793 provides:
 (a) Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 706(7) of this title. The provisions of this section shall apply to any subcontract in excess of $2,500 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States. The President shall implement the provisions of this section by promulgating regulations within ninety days after September 26, 1973.
 (b) If any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to employment of handicapped individuals, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.
 (c) The requirements of this section may be waived, in whole or in part, by the President with respect to a particular contract or subcontract, in accordance with guidelines set forth in regulations which he shall prescribe, when he determines that special circumstances in the national interest so require and states in writing his reasons for such determination.
 
 
 [2]
 The language required to be included is set forth in 41 C.F.R. Sec. 60-741.4 (1984) and provides in its entirety:
 Affirmative Action for Handicapped Workers
 (a) The contractor will not discriminate against any employee or applicant for employment because of physical or mental handicap in regard to any position for which the employee or applicant for employment is qualified. The contractor agrees to take affirmative action to employ, advance in employment and otherwise treat qualified handicapped individuals without discrimination based upon their physical or mental handicap in all employment practices such as the following: Employment, upgrading, demotion or transfer, recruitment, advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.
 (b) The contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.
 (c) In the event of the contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations and relevant orders of the Secretary of Labor issued pursuant to the Act.
 (d) The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Director, provided by or through the contracting officer. Such notices shall state the contractor's obligation under the law to take affirmative action to employ and advance in employment qualified handicapped employees and applicants for employment, and the rights of applicants and employees.
 (e) The contractor will notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the contractor is bound by the terms of section 503 of the Rehabilitation Act of 1973, and is committed to take affirmative action to employ and advance in employment physically and mentally handicapped individuals.
 (f) The contractor will include the provisions of this clause in every subcontract or purchase order of $2,500 or more unless exempted by rules, regulations, or orders of the Secretary issued pursuant to section 503 of the Act, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the Director of the Office of Federal Contract Compliance Programs may direct to enforce such provisions, including action for noncompliance.
 
 
 [3]
 Two circuits have considered this question. The Sixth Circuit failed to distinguish it from the determination of whether a private right of action arises directly under the statute. Hoopes v. Equifax, Inc., 611 F.2d 134 (6th Cir.1979). The Tenth Circuit noted that a third-party beneficiary claim was "but another aspect of the implied right of action argument," and cited Hoopes. Hodges v. Atchison, T. & S.F. Ry., 728 F.2d 414, 416 (10th Cir.1984), certiorari denied, --- U.S. ----, 105 S.Ct. 97, 83 L.Ed.2d 43
 The district courts that have considered the question reached the same conclusion we have, that a third-party beneficiary theory is of no avail in this kind of case. Chaplin v. Consol. Edison Co., 579 F.Supp. 1470 (S.D.N.Y.1984); Davis v. United Air Lines, Inc., 575 F.Supp. 677 (E.D.N.Y.1983) (case before district court on an amended complaint after Second Circuit determined that no private remedy directly under the statute would lie); Stephens v. Roadway Express Co., 29 Empl.Prac.Dec. p 32,941 (N.D.Ga.1982); Coleman v. Noland Co., 21 Fair Empl.Prac.Cas. 1248 (W.D.Va.1980).
 
 
 [4]
 Our decisions in Ernst and Simpson are in accord with the decisions of eight other circuits on this issue. Hodges v. Atchison, T. & S.F. Ry., supra; Painter v. Horne Bros., Inc., 710 F.2d 143 (4th Cir.1983) (per curiam); Beam v. Sun Shipbuilding & Dry Dock Co., 679 F.2d 1077 (3d Cir.1982) (per curiam); Fisher v. City of Tucson, 663 F.2d 861 (9th Cir.1981), certiorari denied, 459 U.S. 881, 103 S.Ct. 178, 74 L.Ed.2d 146; Davis v. United Air Lines, Inc., 662 F.2d 120 (2d Cir.1981), certiorari denied, 456 U.S. 965, 102 S.Ct. 2045, 72 L.Ed.2d 490; Simon v. St. Louis County, 656 F.2d 316 (8th Cir.1981), certiorari denied, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688; Rogers v. Frito-Lay, Inc., 611 F.2d 1074 (5th Cir.1980), certiorari denied, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115; Hoopes v. Equifax, Inc., 611 F.2d 134 (6th Cir.1979) (failing to distinguish between third-party beneficiary claim and private cause of action)
 
 
 [5]
 The EEOC's instituting the suit in Liberty Trucking further indicates the limited relevance this suit has for the instant situation. An analysis similar to that pertaining to Liberty Trucking and Holbrook applies as well to Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246, in which an employee sued his employer for breach of a collective bargaining agreement the employer had signed with the union. Again, the agreement served no purpose except to benefit the employee, since its provisions would have been directed exclusively at employees and work relations. The Court held that the employee's state law action was not preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. Thus, like Howard v. Uniroyal, Inc., supra, the case is also distinguishable because it deals with federal preemption of state law claims, not whether the federal statutory scheme would permit federal common law claims
 
 
 [6]
 Rogers involved the issue of a private remedy arising directly under Section 503. D'Amato correctly points out that cases determining whether a private right of action is available under Section 503 are not squarely on point. Indeed, the Fifth Circuit in Rogers expressly left open the question D'Amato presents--the possibility of a third-party beneficiary action on the affirmative action clauses that Section 503 requires. Rogers, 611 F.2d at 1079 n. 5. Still the analysis contained in Rogers and similar cases is relevant insofar as such cases focus on Congressional intent in enacting Section 503 and the nature and extent of the rights and remedies Congress created therein. Hodges v. Atchison, T. & S.F. Ry., supra; Davis, 575 F.Supp. at 680 ("[a]lthough whether the plaintiff has a private right of action under the statute is conceptually distinct from whether the plaintiff may sue as a third-party beneficiary of the contract mandated by the statute, the same considerations largely determine both issues")
 
 
 [7]
 29 U.S.C. Sec. 794 provides:
 No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.
 
 
 [8]
 Our research has revealed no cases involving an attempt to sue under Section 504 as a third-party beneficiary. That is because the availability of a private cause of action directly under the statute obviates the need to try to avoid an otherwise conclusive bar against a private lawsuit
 
 
 [9]
 Congress transferred responsibility for enforcing Section 504 to the Department of Education when it abolished HEW in 1979. See 20 U.S.C. Sec. 3441(a)(4)(A). The Department of Education also assumed responsibility for enforcing Title IX of the Education Amendments of 1972. Id. Sec. 3441(a)(1)
 
 
 [10]
 The Supreme Court vacated Meyerson and remanded for consideration in light of its recent decision of Consol. Rail Corp. v. Darrone, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568. Darrone held that the primary objective of the government aid that formed the predicate of a Section 504 lawsuit need not be to promote employment. Meyerson involved claims under both Sections 503 and 504. The Ninth Circuit dealt with the Section 503 claim summarily on the basis of its earlier decision in Fisher v. City of Tucson, supra. Meyerson, 709 F.2d at 1238. The court discussed the Section 504 claim in greater depth and denied recovery on the grounds that the primary objective of the federal financial assistance involved was not to promote employment. Id. at 1237. Darrone, then, affects this part of the Ninth Circuit's holding only and leaves untouched its conclusions regarding the unavailability of a private right of action under Section 503
 Also untouched is the Ninth Circuit's extensive discussion of the possibility of a 42 U.S.C. Sec. 1983 action based on a violation of Section 503. The court refused to hear such an action, holding that to do so would circumvent the Congress' clear intent that an administrative remedy be the sole one available for Section 503 violations. Id. at 1238-1240. Considering the case on remand, the Ninth Circuit vacated the judgment of the district court on the Section 504 claim and remanded it for further consideration in light of Darrone, but let stand the remaining parts of its earlier judgment. Meyerson v. Arizona, 740 F.2d 684, 685 (1984).
 
 
 [11]
 29 U.S.C. Sec. 794a provides in relevant part:
 (b) In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 [12]
 D'Amato argues that Congress could not have meant the administrative remedies of Section 503 to be exclusive, because it has not preempted state laws banning discrimination against the handicapped. This argument conflates preemption analysis with the determination whether Congress intended a federal remedy in addition to the one explicitly authorized in the statute to be available. D'Amato's argument also overly generalizes the situation by not focusing on whether certain potential state remedies--specifically state law third-party beneficiary claims--would conflict with federal law, while other state remedies might harmonize with the federal scheme. In fact at least two courts have found state common law claims based on the affirmative action clauses at stake here preempted by Section 503. Howard v. Uniroyal, Inc., supra; Stephens v. Roadway Express Co., 29 Empl.Prac.Dec. p 32,941 at 26,454-26,455 (N.D.Ga.1982) (also rejecting a third-party beneficiary claim based on federal common law, id. at 26,455)
 
 
 [13]
 Wisconsin common law would bar such a claim, for its courts would treat the state statutory remedy available for discrimination against the handicapped as the exclusive remedy available for wrongful discharge. Brockmeyer v. Dun & Bradstreet, 113 Wis.2d 561, 576 n. 17, 335 N.W.2d 834 n. 17 (1983). Indeed the district court treated this claim as one based on state law. But it is barred even if it arises under federal law, for the reasons discussed herein
 
 
 [14]
 The OFCCP has not approved the conciliation agreement the Company proposed in October 1982. Whether we could allow suit if the Company had signed a conciliation agreement is a question that is not before us and that we do not decide
 
 
 [15]
 As will be discussed infra, D'Amato also could have instituted proceedings under the collective bargaining agreement between the Company and the Union. Alternatively, state proceedings are available, and D'Amato is in fact pursuing such a claim against the Company (Br. at 14). Our decision today does not leave those in his position without a remedy
 
 
 [16]
 Section 1985(3) provides:
 (3) If two or more persons in any State or Territory conspire * * *, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 D'Amato also bases his third count in part on 42 U.S.C. Sec. 1986, which provides in relevant part:
 Every person who, having knowledge that any of the wrongs * * * mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured * * *.
 This Section is derivative of Section 1985, and without a violation of Section 1985, Section 1986 is not violated. Williams v. St. Joseph Hospital, 629 F.2d 448, 452 (7th Cir.1980); Tomkins v. Village of Tinley Park, 566 F.Supp. 70, 80 (N.D.Ill.1983).
 
 
 [17]
 The Supreme Court recognized the difference between sex and physical handicaps in Frontiero v. Richardson, 411 U.S. at 686-687, 93 S.Ct. at 1770-1771:
 And what differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society. As a result, statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members.
 
 
 [18]
 Similar reasoning prompted the Ninth Circuit to refuse to allow 42 U.S.C. Sec. 1983 to support a disguised Section 503 claim. See Meyerson, supra, discussed supra n. 10
 
 
 [19]
 The claim is founded on Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. Section 185(a) expressly allows "[s]uits for violation of contracts between an employer and a labor organization."
 
 
 [20]
 Thus the exception to the exhaustion doctrine for a union's breach of its duty of fair representation, which would render pursuit of a contractual remedy ineffectual, is also unavailable. Anderson v. Alpha Portland Industries, Inc., 727 F.2d 177 (8th Cir.1984), is not to the contrary. Procedurally, the Eighth Circuit's decision to rehear the case en banc on February 19, 1984, vacated the panel decision relied on by D'Amato. En banc the Eighth Circuit reached the same result the panel had, but its reasoning does not lend D'Amato the support he would claim. The Eighth Circuit relied heavily on Schneider Moving & Storage Co. v. Robbins, --- U.S. ----, 104 S.Ct. 1844, 80 L.Ed.2d 366, which was decided subsequent to the panel decision in Anderson and which affirmed the Eighth Circuit's earlier decision of Robbins v. Prosser's Moving & Storage Co., 700 F.2d 433 (8th Cir.1983) (en banc). Anderson turned on the distinction between retirees, whom the union is not obligated to represent and whose interests differ greatly from those of active employees, and active employees, who must rely on the union as their exclusive representative and for whom the bargaining agreement remedies are mandatory. The Eighth Circuit held that a presumption in favor of requiring arbitrability did not exist when the plaintiffs were outside the collective bargaining relationship between the union and its active employee members. Anderson v. Alpha Portland Industries, Inc., 752 F.2d 1293, 1298 (8th Cir.1985) (en banc). Probationary employees like D'Amato are appropriate members of the Union's collective bargaining unit to whom the Union owes a duty of fair representation, facts that preclude reliance on Anderson
 
 
 [21]
 We do not decide whether DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476, requires a six-month statute of limitations period. The dispositive factor in DelCostello was the alleged breach by the union of its duty of fair representation that rendered inapplicable the state statute of limitations for the vacation of arbitration awards. The Supreme Court in DelCostello was very careful not to overrule its earlier decision in United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732, which had borrowed the state statute of limitations for a Section 301 suit by an employee against the employer only. The facts of the instant situation fall between the two cases. On the one hand, the Union is named as a party in interest only, and is not claimed to have breached any duty to D'Amato. On the other hand, D'Amato's failure to institute grievance proceedings under the Agreement means that no arbitrator has considered the question and distilled the issues, nor has an arbitrator's award ever been obtained. Our decision on the exhaustion issue obviates the need to determine which statute of limitations is most appropriate
 
 
 [22]
 This is the relief sought by the Company, Union, federal employees and amicus curiae Equal Employment Advisory Council